UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

SALLY RAMIREZ,

                         Plaintiff,

               -against-

CITY OF NEW YORK, S. DEVI JEWRAM,
DARSHAN TAYLOR and JOHN and JANE DOE
(said names being fictitious, the persons intended
being those who aided and abetted the unlawful
conduct of the named Defendants),

                         Defendants.

------------------------------------------------------------X

**SECOND AMENDED
COMPLAINT**

Docket No.: 24-cv-01061-AS

**JURY TRIAL
REQUESTED**

Plaintiff, **SALLY RAMIREZ** ("Plaintiff" or "Ramirez"), by her attorneys, **MADUEGBUNA COOPER LLP**, for her Second Amended Complaint alleges:

## I.    THE NATURE OF THIS ACTION

1. This is an action for injunctive relief, declaratory judgment and money damages to remedy discrimination and retaliation on the basis of race, color, national origin, age and disability in the terms, conditions and privileges of employment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.* ("Title VII"); 42 U.S.C. § 1981(a) ("Section 1981") and the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("Rehabilitation Act"); New York State Human Rights Law as contained in New York State Executive Law, § 296, *et seq.* ("NYSHRL") and New York City Human Rights Law as contained in the Administrative Code of the City of New York, § 8-107, *et seq.* ("NYCHRL") as well as retaliation for opposing discriminatory conduct.

2.      Ramirez contends that the terms, conditions, and privileges of her employment relationship with the CITY OF NEW YORK (the "City") and its agency, the Human Resources Administration/Department of Social Services ("HRA") were adversely affected because of her race, color, national origin, age and disability and in retaliation for her opposition to discriminatory conduct.

3.      Specifically, to discriminate and retaliate against her, Ramirez, a long-standing City employee of more than 30 years, presently a Director, Administrative Staff Analyst, Level M-2 in HRA's Finance Department and a 61-year-old Guyanese woman of Indian descent, was passed over for promotion to a position which was not even posted for City employees to apply in favor of younger and less experienced white male.

4.      Although the defendants attempted to hide the posting in order to secretly push through a candidate of their choice, a vastly less tenured and less experienced, younger white male, Ramirez still found the posting and applied right away. Yet, she was not even given an interview, proving that all along the process was a sham designed to promote the younger, less qualified and less experienced white male.

5.      To make worse an already intolerable situation, on November 29, 2024, Ramirez requested an extension of her reasonable accommodation to telework, which had been in place since April 4, 2023, enabling her to satisfactorily perform her duties despite her medical conditions. However, HRA, acting through Defendants S. Devi Jewram and Darshan Taylor— the less experienced and younger white male who was favored over her for promotion and is now in charge—unjustly denied this necessary request for Monday through Wednesday remote work, in addition to the established Thursday and Friday hybrid days. They claimed it would "cause an

undue burden regarding operational needs and staffing," a rationale devoid of legitimate justification and clearly driven by discriminatory animus and retaliation for her legal action.

6.    By unjustly denying this reasonable request, HRA and the Defendants have forced Ramirez to return to an office where she would face ongoing humiliation and exposure to her former subordinates, despite her medical condition, which makes commuting to the office physically impossible. HRA's actions have left her no choice but to retire, thereby significantly worsening her physical and emotional distress and violating her rights under the law.

7.    Accordingly, this action is brought to vindicate Plaintiff's human and civil rights.

## II.    **JURISDICTION AND VENUE**

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

9.    This Court has supplemental jurisdiction over the state causes of action pleaded.

10.    Venue is proper in this district under 28 U.S.C. § 1391(b) because the underlying events took place in this district.

## III.    **PROCEDURAL REQUIREMENTS**

11.    On February 24, 2023, charges of discrimination were filed with the U.S. Equal Employment Opportunity Commission ("EEOC") pursuant to Title VII and the ADEA.

12.    The EEOC issued a Right to Sue Notice to Ramirez on November 15, 2023, which she received on November 15, 2023.

13.    This lawsuit was commenced within 90 days of Ramirez receiving the Right to Sue Notice.

14.    After commencing this action, Ramirez served a copy of the complaint upon the

New York City Commission of Human Rights and the Corporation Counsel of the City of New York, in accordance with New York City Administrative Code Section 8-502(c).

**IV.    <u>PARTIES</u>**

15.    Ramirez is a 61-year-old Guyanese female of Indian descent.

16.    Ramirez is a resident of the City and State of New York, residing in Staten Island, New York.

17.    Defendant CITY is a municipal corporation existing under and by virtue of the laws of the State of New York.

18.    Until her promotion in June 2022, Defendant S. DEVI JEWRAM ("JEWRAM") was employed by HRA as the Assistant Deputy Commissioner of Finance/Office of Revenue Management and Development ("ORMD").

19.    JEWRAM currently serves as the Deputy Commissioner of Finance/ORMD.

20.    JEWRAM is a Guyanese female who, upon information and belief, is in her mid-50s.

21.    At all relevant times, JEWRAM was responsible for ensuring that employees were not subjected to discriminatory or retaliatory practices and directly supervised Ramirez from 2018 to June 2022.

22.    JEWRAM is sued in her personal capacity for monetary damages and in her official capacity for injunctive relief.

23.    Since January 2023, DARSHAN TAYLOR ("TAYLOR") has been the Assistant Deputy Commissioner of the Bureau of Revenue Development and Automation.

24.    TAYLOR is a white male who, upon information and belief, is in his late

30s/early 40s.

25.     At all relevant times, TAYLOR was responsible for ensuring that employees were not subjected to discriminatory or retaliatory practices.

26.     At all relevant times, Defendants were acting under color of the statutes, ordinances, regulations, customs and usages of the United States and the State of New York, and under the authority of their respective positions or offices.

27.     At all relevant times, JEWRAM and TAYLOR had authority to assign duties and responsibilities to employees; supervised and controlled employee work schedules and conditions of employment; and possessed authority to promote, demote, assign responsibilities, and, if necessary, terminate employees.

## V.     FACTS COMMON TO ALL CAUSES OF ACTION

*Ramirez's Background and Education*:

28.     Ramirez is a military veteran, having served in the United States Army from 1984 to 1988 and honorably discharged.

29.     Ramirez earned a Bachelor of Business Administration degree in Computer Information System from Baruch College in 1992.

30.     In 2014, Ramirez took graduate level courses in Human Resources Management and Leadership from Long Island University.

31.     In 2014, Ramirez also attended the Organizational Management and Leadership Academy at Hunter College.

*Ramirez's Extensive Skill, Qualification and Experience*:

32.     In 1989, Ramirez began working for the City of New York as a Principal

Administrative Associate with Crisis Intervention Service and a year later transferred to the Food Stamp Program as an Associate Staff Analyst.

33.     In 1996, Ramirez transferred to the City's Administration for Children's Services ("ACS"), Management Analysis Unit, with a civil service title of Associate Staff Analyst and office title of Senior Program Analyst.

34.     As Senior Program Analyst, Ramirez participated in agency reform initiatives, developed expertise, and trained staff in ACS data warehousing and prepared monthly reports to submit to the ACS Commissioner.

35.     In 2005, Ramirez moved to become an Associate Staff Analyst in HRA's Finance Office.

36.     In 2006, Ramirez was promoted to the civil service title of Administrative Staff Analyst.

37.     As a result of the promotion, in 2006, Ramirez became Director, Managerial Level 2.

38.     In the Director position, Ramirez has been primarily responsible for developing, managing and automating revenue projects and providing analytical and technical research to internal departments and external agencies using the HRA Data Warehouse.

39.     As Director, Ramirez represents the Finance Office, as the Business Analyst Lead, in all interactions and is responsible for coordinating all training and user acceptance testing, amongst other responsibilities.

40.     In her written performance evaluation as Director for the period January 1 to December 31, 2012, Ramirez received an overall rating of "exceptional."

41.    Indeed, in the five evaluations she received as Director, four of the five were rated "exceptional," and the fifth was rated "greatly exceeds expectations."

42.    At all relevant times, Ramirez has continued to perform exceptionally in her director position, with no complaints about her work.

43.    At all relevant times, Ramirez managed her department, HRA's Finance Office, during the absences of the Assistant Deputy Commissioners, Gordon Kraus Friedberg and JEWRAM.

44.    In fact, until she was unlawfully passed over for promotion, when JEWRAM was out of the office, Ramirez was the Director who covered for her, and all JEWRAM's staff in HRA's Finance Office would report to Ramirez.

*Darshan TAYLOR is Hired by HRA*:

45.    In August 2013, TAYLOR joined HRA as an Associate Staff Analyst.

46.    At the time that TAYLOR arrived at HRA, his background of approximately twelve years consisted primarily of research and alternatives analysis for banks and business management consultants.

47.    At all relevant times, until her retirement in June 2022, Tabitha Brown ("Brown") was the Deputy Commissioner of Finance/Office of Revenue Management and Development.

48.    In 2015, Brown hired TAYLOR to be her assistant after TAYLOR's supervisor was promoted to a different department.

49.    In 2016, Brown promoted TAYLOR to a computer title while he was still on the civil service list.

50.    In 2017, TAYLOR was picked up off the civil service list by Brown and given the

title of Director of the Bureau of Revenue Optimization and Automation.

*JEWRAM's History of Age-Related Comments (Background Evidence)*:

51.    From approximately 2018 to June 2022, when JEWRAM supervised Ramirez, JEWRAM made comments about older staff in HRA's Finance Office not retiring.

52.    JEWRAM's ageist comments and statements have been overheard by many employees, including Ramirez, given the open layout of the office.

53.    JEWRAM has also commented to Ramirez on several occasions that because she is in an age 57 retirement plan, Ramirez, who is in an age 62 plan, will still be at HRA after JEWRAM retires.

54.    As a result of JEWRAM's comments and her failure to provide upward mobility for Finance staff, she has frequently told Ramirez and Ramirez's staff since 2018 that if they were unhappy at HRA, then they should move on because there were no opportunities to progress.

55.    As a result, at least one Finance employee took an early retirement with penalties at age 59 and told staff, including JEWRAM, that there was a lack of opportunities in the unit for all employees, particularly older employees.

*JEWRAM has made Discriminatory Comments on the Basis of Age and National Origin*:

56.    JEWRAM has been known to make outright discriminatory comments based on age and national origin.

57.    In early 2022, JEWRAM, who like Ramirez is of Guyanese national origin, told Ramirez that she would not return to Guyana after retiring, as she did not like the country or Guyanese people.

- 8 -

58.     JEWRAM has also made comments about being glad her son does not live with a Guyanese woman and told Ramirez that after speaking with a "smart" Guyanese doctor, that interaction might change her mind on her feelings towards Guyanese people.

59.     On several occasions, whenever JEWRAM had the opportunity, she would remind Ramirez that she had an MBA and J.D., and that most Guyanese were borderline illiterate.

60.     JEWRAM also told Ramirez many times that she had never known many smart Guyanese people.

61.     JEWRAM also has a history of putting down colleagues of Guyanese national origin, including a male employee who had left for a better promotional opportunity and who JEWRAM claimed was not a bright person and that she did not want to keep him.

62.     In addition, at all relevant times, JEWRAM often told Ramirez that another Guyanese employee who had applied and been promoted to an Assistant Commissioner position in HRA was unqualified and should not have been promoted.

63.     At different times from 2018 to 2022, JEWRAM told and made clear to Ramirez that she wanted to fill the department with new and younger people.

64.     In the spring of 2022, Ramirez and JEWRAM interviewed candidates for a Computer Associate, Level 2 position, which was in Ramirez's unit.

65.     One of the candidates was Anthony Meijas ("Meijas"), who was an older worker.

66.     Following the interview, JEWRAM privately told Ramirez that Meijas is in retirement age and might leave at any time.

67.     In contrast, Ramirez told JEWRAM that she intended to offer Meijas the position,

as he had over thirty years of programming experience, and Ramirez had been struggling to fill the position with a qualified programmer for over two years.

68.    JEWRAM objected to Ramirez offering Meijas the position, telling Ramirez that "He's old, he's old."

69.    Ramirez reminded JEWRAM that such discriminatory comments were not only unlawful, but that the department could get into trouble for discriminating because of age.

70.    Despite JEWRAM's objection, unlawful and discriminatory comments and position, on June 27, 2022, Ramirez officially hired Mejias to the Computer Associate, Level 2 position.

71.    JEWRAM was upset by this hiring, as she wanted to fill the department with new and younger people, and since then JEWRAM has been looking for opportunities to treat Ramirez differently.

*Jewram was Involved in Interviewing and Selecting Candidates to fill the Assistant Deputy Commissioner of the Bureau of Revenue Development and Automation Position:*

72.    Four months later, in October 2022, Ramirez inadvertently located a posting for the Assistant Deputy Commissioner of the Bureau of Revenue Development and Automation position (the "ADC position") in HRA's Citywide personnel system.

73.    Prior to Ramirez inadvertently locating this positing, she had no knowledge the ADC position would be posted.

74.    At all relevant times, Ramirez made JEWRAM know that she was interested in promotion to higher positions, such as the ADC position.

75.    Despite Ramirez being the immediate and direct report of JEWRAM for four years and having no issues with Ramirez's work, JEWRAM hid and never informed Ramirez of

the fact that the vacancy for the ADC position had been advertised for filling.

76.    In fact, prior to Ramirez inadvertently locating the posting for the ADC position, JEWRAM repeatedly told Ramirez that TAYLOR, who with Ramirez reported directly to JEWRAM, is young and still learning, when JEWRAM left Ramirez in charge of the department when she was out, instead of TAYLOR.

77.    With over 30 years' experience working for the City, 18 of which were in a managerial position, Ramirez is familiar with the system and process for filling vacancies at HRA, particularly with her department – HRA's Finance Office.

78.    JEWRAM, with full knowledge of Ramirez's opposition to JEWRAM's ageist comments and in retaliation for her complaints about these comments and the hiring of Meijas, purposely did not place the posting in HRA's internal (citywide) personnel system to prevent Ramirez from applying.

79.    Contrary to the usual practice at HRA, the flyer for the ADC position was never posted internally for HRA employees, but only publicly.

80.    HRA's usual practice concerning filling open positions such as the ADC position begins by JEWRAM and the Department's Human Resource Business Partner preparing a flyer for the position.

81.    At the time Ramirez inadvertently located the posting for the ADC position, JEWRAM was the head of Ramirez's department, having replaced Tabitha Brown as Deputy Commissioner.

82.    The ADC position was JEWRAM's previous position or role within the department, as she had just moved up to a higher position, following the retirement of Brown.

83.     The person selected or hired to fill the ADC position was to report to JEWRAM.

84.     The person selected to fill the ADC position would act as JEWRAM's right-hand and manage the department in JEWRAM's absence.

85.     Given that this was her previous role, with assistance from the department's Human Resource Business Partner, JEWRAM drafted the flyer containing the job requirements and qualifications for the ADC position.

86.     JEWRAM sent the flyer for the ADC position to the Department's Human Resource Business Partner for both internal and external posting, and the Human Resource Business Partner screened the resumes received.

87.     By JEWRAM and the Department's Human Resource Business Partner posting the flyer for the ADC position only publicly, the posting was less likely to be found by civil servants, such as Ramirez, searching for promotional opportunities.

88.     For the ADC position, the Department's Human Resource Business Partner forwarded the resumes received in response to the flyer to JEWRAM, who from there would set up interviews to fill the ADC position.

89.     As of the time of seeking to fill the ADC position, HRA's personnel department was supposed to have a comprehensive system to manage the interview process and prevent any appearance of impropriety, including conducting structured interviews where all candidates are asked the same questions.

90.     For managerial positions such as the ADC position, a panel of three people is generally required and responsible for rating the interviewees and retaining all relevant materials.

91.     After the interviews, the panel discusses their ratings and typically selects the

highest rated candidate for the position.

92.    JEWRAM selected the candidates interviewed for the ADC position.

93.    JEWRAM was required to be and was on the panel, as the vacancy was in her department.

94.    It would not have conformed to HRA's hiring process for someone other than JEWRAM to select a candidate to work reporting directly to her.

95.    In addition, no one in the agency besides JEWRAM would have had full knowledge of the skillset JEWRAM was looking for to fill the ADC position.

96.    It would have been unprecedented for any HRA manager to have filled the ADC position without the input and approval of JEWRAM, the head of Ramirez's department.

97.    As the head of Ramirez's department, JEWRAM had an influence over who to promote or not promote to the ADC Position.

*Ramirez Applies for the Assistant Deputy Commissioner Position:*

98.    On October 21, 2022, Ramirez submitted her application for the ADC position.

99.    The ADC position required responsibility for supervising two divisions within the Bureau of Revenue Development and Automation ("BRDA"), developing, automating and managing complex revenue generating and risk avoidance projects, providing financial analysis and technical support and conducting research.

100.    All the core listed tasks for the open ADC position were within Ramirez's skillset and she was well-qualified for the position, having worked as Director in HRA's Finance office for over 15 years, and performed exceptionally well.

101.    Yet, Ramirez was not even granted the courtesy of an interview by JEWRAM

following her application for the ADC position.

102.    Indeed, around the time that Ramirez applied for the ADC position, JEWRAM waited until Ramirez was out of the office to assist TAYLOR with preparing and updating his resume used for his application to the ADC position.

103.    JEWRAM assisted TAYLOR with preparing and updating his resume used for his application to the ADC position to ensure that she could justify the selection of TAYLOR, a less qualified and younger white male, over the more qualified and older, non-white Ramirez.

104.    Based on her remarks during her tenure as Assistant Commissioner in the department about older employees and that Guyanese people are not bright, JEWRAM assisted TAYLOR with preparing and updating his resume so as not to promote Ramirez, a Guyanese individual whom she has a disdain for, as she believes Guyanese are not bright people.

105.    In 2022, once the ADC position was vacant, JEWRAM took TAYLOR, instead of Ramirez, who is more qualified, to a high-level meeting regarding the discovery of a $5 million fraud case.

106.    By excluding Ramirez from this high-level meeting on the $5 million fraud case, JEWRAM began setting TAYLOR up as her chosen replacement and had TAYLOR acting in the role even before the vacancy for the ADC position was announced and filled.

*Ramirez is Denied Promotion in Favor of the Far Less Qualified TAYLOR*:

107.    On January 3, 2023, Ramirez learned for the first time, in a memorandum addressed to Finance staff by JEWRAM, that TAYLOR had been selected for the ADC position.

108.    In the January 3 memorandum, JEWRAM listed the alleged accomplishments of TAYLOR to include that TAYLOR had been responsible for developing Anti-Eviction and

Homeless claims systems.

109.    To the contrary, responsibility for developing Anti-Eviction and Homeless claims systems had been done by Ramirez's staff, and credit for that work was taken away from Ramirez and her team and used by JEWRAM to bolster TAYLOR's credentials and supposed qualifications for the ADC position.

110.    JEWRAM also gave TAYLOR credit for Supplemental Nutrition Assistance Program and Medical Support Enforcement projects that had been developed long before he was hired by HRA.

111.    In reality, TAYLOR has no exceptional skills that qualify him for the ADC position.

112.    In contrast, Ramirez has over 35 years of experience with the City and has been a Director for over 18 years, while TAYLOR has less than six years managerial experience.

113.    At all relevant times, Ramirez was involved with the development of almost every project in HRA's Finance office and has knowledge of all ongoing projects in the department, whereas TAYLOR has not developed any such project from scratch to Ramirez's knowledge.

114.    Ramirez is aware of several significant errors that have been made by TAYLOR while working for Tabitha Brown. As an example, before his promotion to the ADC position, TAYLOR incorrectly vetted data used to send Forms 1099 to landlords and sent the forms late, potentially risking HRA getting sanctioned by the New York State Department of Taxation and Finance in 2019.

115.    Ramirez is also the most senior manager in the unit, while JEWRAM herself admitted to Ramirez and others that TAYLOR was young and still learning and that JEWRAM

had to provide a lot of guidance to him, whereas Ramirez was self-sustaining and an excellent manager.

116.    Despite Ramirez's sterling and superior qualifications, HRA and JEWRAM promoted TAYLOR and passed Ramirez over with no justifiable cause.

117.    JEWRAM promoted TAYLOR and passed over Ramirez in further retaliation against Ramirez for her hiring of Meijas and complaints about JEWRAM's discriminatory comments based on age.

118.    Given JEWRAM's comments about age and national origin and the fact that the flyer for the ADC Position was never internally posted, Defendants denied Ramirez promotion to the ADC position because of age, national origin and other unlawful consideration because they already planned to give the job to TAYLOR, a much less qualified white, younger man.

119.    JEWRAM deliberately passed Ramirez over for promotion because she has disdain for people of Guyanese national origin and does not believe that they are "bright."

120.    At all relevant times including when Ramirez inadvertently located the posting for the ADC position and she was not selected for the ADC Position, JEWRAM was displeased and upset with Ramirez for hiring Mejias to the Computer Associate, Level 2 position, over JEWRAM's objection that Mejias was "old."

*Ramirez has Suffered Physical and Emotional Distress*:

121.    Upon learning of TAYLOR's promotion and her being passed over, Ramirez developed severe stomach pain and abnormally rapid heart rate and vomited in the bathroom. When an employee asked Ramirez later if she was okay, Ramirez admitted that she felt like she was having a nervous breakdown.

122. As a result, Ramirez immediately applied for FMLA leave, which JEWRAM informed the unit of on January 4, during a meeting to congratulate TAYLOR on his promotion.

123. Ramirez was diagnosed with anxiety and prescribed medication to manage her symptoms.

*Ramirez is Retaliatorily Denied a Reasonable Accommodation*:

124. On or about April 4, 2023, Ramirez was granted a reasonable accommodation to telework, which was due to expire on December 26, 2024.

125. The reason for this request was due to Ramirez being diagnosed with Postherpetic Neuralgia (a painful complication of shingles), osteoporosis and an anxiety disorder.

126. Ramirez's anxiety disorder stems from the discriminatory selection of TAYLOR for the ADC position.

127. All of these conditions collectively impact Ramirez's ability to perform certain activities, including her regular work functions, in an office setting.

128. While Ramirez worked remotely, there were no issues with completing assignments or managing her staff.

129. Ramirez did not receive any complaints that her work was lacking or that staffing shortages were affected.

130. On November 29, 2024, Ramirez submitted to HRA's Equal Employment Opportunity Office ("EEO") a request to extend her reasonable accommodation.

131. The request was sent to TAYLOR that same day to advise if the Finance Office could accommodate Ramirez.

132. On December 2, 2024, TAYLOR provided a response to the EEO Office.

133.    On December 19, 2024, in response to Defendants' second motion to dismiss this lawsuit as against JEWRAM based on categorical denials that JEWRAM had no personal involvement in the promotion process, this Court denied the motion and issued an Order that:

> "The factual allegations in the Amended Complaint, taken as true for the purposes of this motion to dismiss, sufficiently plead that Jewram was personally involved in the promotion decision and that Ramirez suffered retaliation as a result of her engagement in protected activity" ECF Dkt. #38.

134.    On December 20, 2024, Ramirez received an email from Tyeesha McDonald of the EEO Office, advising that:

> "After carefully evaluating your reasonable accommodation request, in consultation with program management and agency personnel, the EEO office is unable to approve your accommodation at this time. The EEO office has determined that your request to telework/work remotely, will not allow you to perform all the essential job duties as a ADMIN STAFF AN NM FMR M2 in OFFICE OF REVENUE MGMNT & DEVELOPMENT. (Your program leadership has indicated that granting your reasonable accommodation request would cause an undue burden with regard to operational need and staffing)."

135.    Both JEWRAM and TAYLOR were copied onto the email as the program management and agency personnel who denied Ramirez's request.

136.    JEWRAM and TAYLOR's claim to the EEO Office that Ramirez's accommodation needed to be denied due to operational needs and staffing was pretext, especially because she had been working remotely for 20 months without issue.

137.    The denial of Ramirez's request is continuing discrimination against her by JEWRAM stemming from the denied promotion to the ADC position.

138.    The denial of Ramirez's request is also in retaliation for her filing this lawsuit and recent developments in this lawsuit, including the decision denying Defendants' motion to

dismiss this lawsuit as against JEWRAM.

*Ramirez Appeals the Denial of her Reasonable Accommodation Request*:

139.    That same day, December 20, Ramirez responded to the email to request further consideration of her request for reasonable accommodation.

140.    In particular, Ramirez provided additional information about how her conditions limited her ability to engage in regular activities, including chronic pain that is exacerbated by stress and limits Ramirez's ability to maintain focus and perform tasks for extended periods; higher risk of fractures that impacts her commuting and stressful work environments that affect her anxiety disorder.

141.    Ramirez also advised the EEO Office that her tasks could be completed effectively from home and she would continue to perform all of the essential functions of her position.

142.    On January 3, 2025, TAYLOR emailed Ramirez that "we expect you to return to the office on January 6th."

143.    On January 9, 2025, Ramirez received the Reasonable Accommodation Determination Appeal Notification, which denied her appeal and told her to consider a long-term leave request and applying for Access-a-Ride.

144.    The fact that HRA recommended a long-term leave request, which would keep Ramirez out of work, and denied her work from home request, which would keep Ramirez working and completing her assignments, is clear evidence of pretext and disability discrimination.

145.    HRA had no legal or reasonable factual basis to deny Ramirez's request to extend

her work from home accommodation.

*Ramirez's Forced Resignation and Termination*:

146.    The decision to deny the continuation of Ramirez's reasonable accommodation was intentionally calculated to humiliate and embarrass her, deliberately create an intolerable workplace environment and compel Ramirez to resign her employment with HRA.

147.    Forcing Ramirez to return to the office subordinates her and forces her to report to TAYLOR, who was promoted over her on the basis of his age, race, color and national origin and despite being far less qualified than Ramirez for the ADC position.

148.    By denying the continuation of the reasonable accommodation and making Ramirez return to in-person work, Ramirez is being made to suffer the daily humiliation of working under TAYLOR, who Finance Office staff know has discriminatorily been promoted over Ramirez.

149.    The humiliation and embarrassment Ramirez has endured as a result of HRA's actions have been so profound and overwhelming that it is impossible for her to continue working there. Since being passed over for a well-deserved promotion, Ramirez has suffered severe anxiety, relentless insomnia, and an overwhelming sense of dread about being physically present at the workplace. The intolerable work environment created by HRA's actions has made it clear that she cannot remain in her position.

150.    When Ramirez discovered she had been unjustly passed over for promotion, she was so shocked and emotionally devastated that she was forced to take an immediate medical leave. This decision was not made lightly, as Ramirez had done nothing wrong and did not deserve to be treated with such callous disregard for her contributions and well-being. While on

medical leave, Ramirez diligently and satisfactorily performed her job responsibilities remotely, but she was haunted by the thought of returning to an office where she would be reporting to TAYLOR —an inherently humiliating situation.

151.    The prospect of returning to HRA filled Ramirez with such anxiety and fear of embarrassment that she even considered resigning. Despite these feelings, Ramirez continued to work remotely to provide for her family, knowing that HRA would likely retaliate by forcing her to return to in-person work. Her worst fears have now been realized. Ramirez has been unjustifiably ordered to return to the office, where she will face a constant stream of colleagues and subordinates who will undoubtedly gawk at her diminished position—in an office she once led with authority and respect.

152.    To compound matters, on November 29, 2024, Ramirez submitted a request to extend her reasonable accommodation to continue working remotely, an accommodation she had been granted since April 4, 2023. However, due to HRA's discriminatory animus against her disability and in retaliation for her filing and continuing this action, her request was unjustly and unreasonably denied. This decision, coupled with the unbearable work environment and her medical conditions, has left Ramirez with no choice but to retire, amounting to a constructive discharge.

153.    Ramirez's treatment by HRA has been not only unjust but deeply damaging, leaving her no viable path to continue her employment without risking further harm to her physical and emotional health.

154.    By subjecting Ramirez to a drastic and unjustified change in the terms of her employment, Defendants are in fact forcing her into involuntary resignation, and thus

terminating her employment with HRA.

155.    As a proximate result of Defendants' discriminatory and unlawful conduct, Ramirez has suffered and continues to suffer significant monetary loss and damages, including the loss of past and future earnings, and other employment benefits.

156.    As a further proximate result of Defendants' actions, Ramirez has suffered emotional distress, lasting embarrassment, humiliation, and anguish, as well as other incidental and consequential damages and expenses.

157.    Defendants' conduct was outrageous and malicious, intended to injure Ramirez, and carried out with reckless indifference to Ramirez's protected civil rights, thereby entitling her to punitive damages.

158.    Ramirez has no complete, plain, clear, or adequate remedy at law.

159.    Defendants' actions were unlawful and in violation of Plaintiff's rights under federal laws, state and local laws.

## FIRST COUNT AGAINST DEFENDANT CITY
### (Discrimination Pursuant to Title VII)

160.    Ramirez repeats and realleges each allegation in each paragraph above.

161.    Defendant City subjected Ramirez to differential terms and conditions of employment because of her race, color and national origin.

162.    These differential terms and conditions of employment include, but are not limited to:

        a.    Making discriminatory comments about individuals of Guyanese national origin;

        b.    Excluding Ramirez from meetings; and

c.  Denying Ramirez promotion to the ADC position in favor of a white male.

163.  By reason of the foregoing, Ramirez suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SECOND COUNT AGAINST DEFENDANT JEWRAM
### (Race Discrimination under Sections 1981 and 1983)

164.  Plaintiff repeats and realleges each allegation in each numbered paragraph above.

165.  Defendant JEWRAM subjected Plaintiff to differential terms and conditions of employment because of her race.

166.  Specifically, Plaintiff was denied promotion to the ADC position because of her race.

167.  Defendant JEWRAM took the foregoing actions in order to deprive Plaintiff of equal employment opportunities and other contractual opportunities on account of her race.

168.  Because of Defendant JEWRAM's willful and deliberate actions, and as a proximate cause thereof, Plaintiff has been denied her right to equal employment opportunity in violation of Sections 1981 and 1983.

169.  By reason of the foregoing, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than One Hundred Thousand ($100,000.00) Dollars.

## THIRD COUNT AGAINST THE CITY
### (Age Discrimination under the ADEA, 29 U.S.C. § 626(b))

170.  Plaintiff repeats and realleges each allegation in each numbered paragraph above.

171.  Ramirez was born in 1963 and is currently 60 years of age.

172.  Ramirez was treated differently on account of her age, including by being denied

- 23 -

promotion to the ADC position in favor of a younger male in his late 30s/early 40s.

173.    The foregoing acts of the CITY constitute unlawful discrimination in violation of the ADEA.

174.    The City's violation of the ADEA was willful.

175.    Ramirez exhausted her administrative remedies under the ADEA before commencing this action.

176.    By reason of the foregoing, Ramirez suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**FOURTH COUNT AGAINST THE CITY**
**(Disability Discrimination pursuant to the Rehabilitation Act)**

177.    Ramirez repeats and realleges each allegation in each paragraph above.

178.    The Rehabilitation Act prohibits discrimination in employment against people with disabilities, including actual and perceived disabilities.

179.    Defendant CITY receives federal funding and is subject to the dictates of the Rehabilitation Act.

180.    Ramirez is a disabled individual within the meaning of the Rehabilitation Act.

181.    Ramirez was well-qualified for her position.

182.    On the basis of her disability, Ramirez was discriminated against by being:

    a.   Denied the continuation of a reasonable accommodation to telework and

    b.   Forced to involuntarily resign her employment, thus being terminated from HRA.

183.    By reason of the foregoing, Ramirez suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## FIFTH COUNT AGAINST THE CITY
### (Retaliation pursuant to the Rehabilitation Act)

184.    Ramirez repeats and realleges each allegation in each paragraph above.

185.    Defendants' aforesaid conduct was also in retaliation for Ramirez's complaints of discrimination on the basis of disability and violated Ramirez's rights under the Rehabilitation Act.

186.    By reason of the foregoing, Ramirez suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SIXTH COUNT AGAINST ALL DEFENDANTS
### (Age, National Origin and Disability Discrimination in Violation of the NYSHRL)

187.    Ramirez repeats and realleges each allegation in each paragraph above.

188.    At all relevant times, Ramirez was an "employee" within the meaning of the NYSHRL.

189.    By adversely affecting the terms, conditions, and privileges of Ramirez's employment because of her age, national origin and disability, Defendants violated the NYSHRL.

190.    By reason of the foregoing, Ramirez has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## SEVENTH COUNT AGAINST ALL DEFENDANTS
### (Age, National Origin and Disability Discrimination in Violation of the NYCHRL)

191.    Ramirez repeats and realleges each allegation in each paragraph above.

192.    At all relevant times, Ramirez was an "employee" within the meaning of the NYCHRL.

193.    By adversely affecting the terms, conditions, and privileges of Ramirez's

employment because of her age, national origin and disability, Defendants violated the NYCHRL.

194.    By reason of the foregoing, Ramirez has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## EIGHTH COUNT AGAINST ALL DEFENDANTS
### (Retaliation)

195.    Ramirez repeats and realleges each allegation in each paragraph above.

196.    In October 2022, JEWRAM and the City retaliated against Ramirez for her complaints against and resistance to discriminatory and unfair employment practices in violation of the NYSHRL and NYCHRL.

197.    The retaliatory conduct complained of includes, but is not limited to, posting the flyer for the ADC position publicly as opposed to internally and denying Ramirez promotion to the position in favor of a younger, less qualified and less experienced male.

198.    In December 2024, Ramirez was further retaliated against for the filing of and continuing the instant action when HRA, based on false statements made by JEWRAM and TAYLOR, unreasonably denied Ramirez's request to continue her work from home accommodation.

199.    By reason of the foregoing, Ramirez has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

## PUNITIVE DAMAGES

200.    Ramirez claims punitive damages by reason of the wanton, unrepentant, reckless and egregious conduct of the individual Defendant alleged.

**WHEREFORE,** Plaintiff prays that this Court grant her judgment containing the

following relief:

a.    Impanel a jury to hear Ramirez's claims;

b.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

c.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

d.    An order directing Defendants to place Ramirez in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment and otherwise unlawful conduct;

e.    An award of damages in an amount to be determined upon the trial of this matter to compensate Ramirez for her monetary loss and damages, including Ramirez's loss of past and future earnings, bonuses, compensation, and other employment benefits;

f.    An award of damages to compensate Ramirez for mental anguish, humiliation, embarrassment, and emotional injury for each cause of action;

g.    An award of damages in an amount to be determined at trial to compensate Ramirez for violations of her rights under Title VII, ADEA, the Rehabilitation Act, the NYSHRL and the NYCHRL;

h.    An award of punitive damages to be determined at the time of trial for the claims under Title VII, ADEA, the Rehabilitation Act, the NYSHRL and the NYCHRL;

i.    An award of reasonable attorneys' fees and costs related to Ramirez's claims

under Title VII, ADEA, the Rehabilitation Act, the NYSHRL and the NYCHRL;

and

j.      Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       January 24, 2025

Respectfully Submitted,

_____
SAMUEL O. MADUEGBUNA, ESQ.
**MADUEGBUNA COOPER LLP**
Attorneys for Plaintiff,
SALLY RAMIREZ
30 Wall Street, 8th Floor
New York, NY 10005
(212) 232-0155

TO:    MURIEL GOODE-TRUFANT
       New York City Law Department
       Attorneys for Defendants
       100 Church Street
       New York, NY 10005

       Attention: Bryan Carr Olert, Esq.

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF NEW YORK*                    *Docket No.: 24-cv-01061-AS*

---------------------------------------------------------------------------------------------------------------------

*SALLY RAMIREZ,*

*Plaintiff,*

*-against-*

*CITY OF NEW YORK, S. DEVI JEWRAM, DARSHAN TAYLOR and JOHN and JANE DOE (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),*

*Defendants.*

---------------------------------------------------------------------------------------------------------------------

## *SECOND AMENDED COMPLAINT AND JURY DEMAND*

---------------------------------------------------------------------------------------------------------------------

*Signature (Rule 130-1.1-a)*

_____

*Print name beneath*
*SAMUEL O. MADUEGBUNA, ESQ.*

_____

*Yours, etc.*

*MADUEGBUNA COOPER LLP*
*Attorneys for Plaintiff*
*30 Wall Street, 8th Floor*
*New York, New York 10005*
*(212) 232- 0155*

*To: All Counsel of Record*
_____

*Service of the within is hereby admitted on*

_____

*Attorneys for*