UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SALLY RAMIREZ,                                    **Docket No.: 24-cv-01061-AS**

                                    Plaintiff,

                -against-

CITY OF NEW YORK, S. DEVI JEWRAM, DARSHAN
TAYLOR and JOHN and JANE DOE (said names being
fictitious, the persons intended being those who aided and
abetted the unlawful conduct of the named Defendants),

                                    Defendants.
-----------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT

MADUEGBUNA COOPER LLP
30 Wall Street, 8th Floor
New York, NY 10005
(232) 232-0155
Attorneys for Plaintiff

**On the Brief:**
Samuel O. Maduegbuna, Esq.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii-v

PRELIMINARY STATEMENT...........................................................................................1

STATEMENT OF FACTS ....................................................................................................2

      A.      Ramirez's Background and Experience ..................................................3

      B.      Jewram's Discriminatory Animus based on Age and National Origin ...................3

      C.      The 2022 Assistant Deputy Commissioner Position....................................4

      D.      Jewram's Involvement in Interviewing and Selecting Candidates .........................5

      E.      Taylor's Selection to Fill the ADC Position............................................6

      F.      Ramirez's Disabilities and Reasonable Accommodation ...........................7

      G.      Appeal of the Denial to Extend Ramirez's Reasonable Accommodation................8

      H.      Ramirez's Forced Early Retirement....................................................10

ARGUMENT .......................................................................................................................10

I.      Ramirez Properly Pled a Section 1981 Claim as against Jewram ....................10

II.      Ramirez Withdraws Age and National Origin Discrimination Claims against Taylor ......12

III.      Ramirez has Stated Valid Claims of Disability Discrimination and Retaliation against the City under the Rehabilitation Act...................................................13

      A.      Legal Standard ...............................................................................13

      B.      Ramirez's Prima Facie Claims Under the Rehabilitation Act...............................14

            1.   Ramirez States a Prima Facie Claim.................................................14

            2.   Denial of a Reasonable Accommodation Is an Adverse Action ......................14

            3.   The Record Supports an Inference of Discriminatory and Retaliatory Motive.............................................................................................15

            4.   The Timeline Supports a Retaliatory Inference ................................16

5.  Internal Inconsistencies and Failures in Process Undermine Defendants' Rationale ........................................................................................16

6.  Evidence of Pretext in Post-Denial Conduct ...................................................17

C.  Temporal Proximity Supports an Inference of Retaliation .......................................18

D.  Ramirez was Constructively Discharged ................................................................19

CONCLUSION .............................................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Ahmad v. White Plains City Sch. Dist.*,
   2020 WL 5720753 (S.D.N.Y. Sept. 24, 2020)........................................................ 19

*Alicea Rosado v. Garcia Santiago*,
   562 F.2d 114 (1st Cir. 1977)........................................................................ 22

*Bucalo v. Shelter Island Union Free Sch. Dist.*,
   691 F.3d 119 (2d Cir. 2012)........................................................................ 18

*Chertkova v. Conn. Gen. Life Ins. Co.*,
   92 F.3d 81 (2d Cir. 1996) ................................................................... 13,20,22

*Doran v. New York State Office of the Medicaid Inspector General*,
   2021 WL 2850460 (S.D.N.Y. July 8, 2021) ............................................... 19

*Duplan v. City of New York*,
   888 F.3d 612 (2d Cir. 2018)..................................................................... 10,11

*E.E.O.C. v. Ethan Allen, Inc.*,
   44 F.3d 116 (2d Cir. 1994)........................................................................ 16

*Flaherty v. Metromail Corp.*,
   235 F.3d 133 (2d Cir. 2000)....................................................................... 20

*Foster v. Univ. of Md. E. Shore*,
   787 F.3d 243 (4th Cir. 2015) .................................................................... 19

*Goonan v. Fed. Reserve Bank*,
   916 F.Supp.2d 470 (S.D.N.Y. 2013)......................................................... 17

*Gorzynski v. JetBlue Airways Corp.*,
   596 F.3d 93 (2d Cir. 2010)........................................................................ 18

*Green v. Brennan*,
   578 U.S. 547 (2016).................................................................................. 20

*Green v. Town of East Haven*,
   952 F.3d 394 (2d Cir. 2020)...................................................................... 22

*Halbrook v. Reichhold Chem, Inc.*,
   735 F. Supp. 121 (S.D.N.Y. 1990)......................................................... 20,21

*Hicks v. Baines*,
   593 F.3d 159 (2d Cir. 2010)........................................................................................ 18

*Kirkland-Hudson v. Mount Vernon City Sch. Dist.*,
   665 F. Supp. 3d 412 (S.D.N.Y. 2023)......................................................................... 14

*Kirsch v. Fleet St., Ltd.*,
   148 F.3d 149 (2d Cir. 1998)........................................................................................ 22

*Knight v. MTA N.Y.C. Transit Auth.*,
   2021 WL 10424509 (E.D.N.Y. Sept. 28, 2021) ................................................... 20,21

*Little v. NBC*,
   210 F. Supp. 2d 330 (S.D.N.Y. 2002)........................................................................ 14

*Lopez v. S.B. Thomas, Inc.*,
   831 F.2d 1184 (2d Cir. 1987)................................................................................. 20,21

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*,
   263 F.3d 208 (2d Cir. 2001)........................................................................................ 17

*McBride v. BIC Consumer Prods. Mfg. Co.*,
   583 F.3d 92 (2d Cir. 2009).......................................................................................... 13

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)................................................................................................ 13,14

*McMillan v. City of New York*,
   711 F.3d 120 (2013)................................................................................................ 13,14

*Morris v. Schroder Cap. Mgmt. Int'l*,
   481 F.3d 86 (2d Cir. 2007).......................................................................................... 20

*Pa. State Police v. Suders*,
   542 U.S. 129, 133 (2004)............................................................................................ 21

*Patterson v. County of Oneida*,
   375 F.3d 206 (2d Cir. 2004)........................................................................................ 11

*Pena v. Brattleboro Retreat*,
   702 F.2d 322 (2d Cir. 1983)........................................................................................ 20

*Pendas v. Runyon*,
   933 F.Supp. 187 (N.D.N.Y. 1996)............................................................................. 22

iv

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ............................................................... 15,16

*Reg'l Econ. Cmty. Action Program v. City of Middletown*,
    294 F.3d 35 (2d Cir. 2002) ......................................................... 16

*Schoenadel v. YouGov America Inc.*,
    No. 22-cv-10236 (AS), 2025 WL 371089 (S.D.N.Y. Feb. 3, 2025) ........................ 22

*Sheng v. M&T Bank*,
    848 F.3d 78 (2d Cir. 2017) ......................................................... 17

*Stratton v. NYC Dept. for Aging*,
    132 F.3d 869 (2d Cir. 1997) ....................................................... 16

*Summa v. Hofstra Univ.*,
    708 F.3d 115 (2d Cir. 2013 ......................................................... 18

*Treglia v. Town of Manlius*,
    313 F.3d 713 (2d Cir. 2002) ....................................................... 19

*Zann Kwan v. Andalex Grp. LLC*,
    737 F.3d 834 (2d Cir. 2013) ....................................................... 19

**Statutes**

42 U.S.C. § 1981(a) .................................................................. 10,11

42 U.S.C. § 1983 ..................................................................... 10,11

Administrative Code of the City of New York, §8-107, et seq ............................ 12,13

New York State Executive Law §296, et seq ............................................ 12,13

Plaintiff Sally Ramirez files this memorandum of law in opposition to the partial motion for summary judgment filed by Defendants City of New York; S. Devi Jewram ("Jewram"), Deputy Commissioner of Finance/Office of Revenue Management and Development of the Human Resources Administration ("HRA") and Darshan Taylor ("Taylor"), Assistant Deputy Commissioner of the Bureau of Revenue Development and Automation (collectively, "Defendants"). (Dkt. # 88.)

## PRELIMINARY STATEMENT

Sally Ramirez is a 61-year-old woman of Guyanese national origin who dedicated 37 years of service to the City of New York, including decades in the Finance Office of HRA, where she rose to the rank of Director and Administrative Staff Analyst, M2. Despite her tenure and extensive qualifications, she was denied a promotion to the Assistant Deputy Commissioner ("ADC") position in favor of a significantly less experienced, younger white male, Taylor. This decision came after years of demeaning, ageist, and xenophobic comments by her then-supervisor, Jewram, who stated, among other things, that she "disliked Guyanese people," believed them to be "illiterate," and wanted "younger people" in the department.

Although Ramirez had long substantively performed the ADC role in Jewram's absence, she was not even given the courtesy of an interview. Instead, the position was given to Taylor, who had been mentored by Jewram and Tabitha Brown. The process was tainted by procedural irregularities: Ramirez was not properly notified of the job posting; resume screening protocols were manipulated; Taylor—himself an applicant—was improperly involved in the interview process, it appears; and hiring norms, such as consulting New York City's Automated Personnel System ("NYCAPS") for known qualified internal candidates, were ignored to ensure Taylor's selection. To justify that selection, Taylor was credited with projects that Ramirez had completed or that predated his employment.

Following Taylor's promotion, Ramirez was required to report to a significantly less experienced and less qualified individual, resulting in a profound loss of professional status, dignity, and morale. This decision not only constituted a discriminatory failure to promote, but also effectively foreclosed any realistic opportunity for advancement—derailing Ramirez's long-standing trajectory toward the Assistant Deputy Commissioner and ultimately Deputy Commissioner roles. With only a few years remaining before her planned retirement, this blocked path eliminated her prospects for career growth, increased pay, and pensionable salary—making continued employment untenable.

The situation worsened when a previously granted reasonable accommodation to telework was revoked—just one day after the Court declined to dismiss Jewram from this lawsuit. This revocation caused substantial emotional and physical distress and ultimately led to Ramirez's early retirement under conditions no reasonable employee would tolerate, amounting to a constructive discharge under federal, state, and city law.

Accordingly, Defendants' motion for partial summary judgment must be denied. Genuine disputes of material fact exist as to whether Ramirez was denied promotion due to her age, national origin, race, and disability; whether Taylor and Jewram retaliated against her for requesting an accommodation and complaining of discrimination; and whether their conduct culminated in Ramirez's constructive discharge.

## STATEMENT OF FACTS

Ramirez brings this lawsuit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.* ("Title VII"); 42 U.S.C. § 1981(a) ("Section 1981") and the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"); the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("Rehabilitation Act"); New York State Human Rights Law as contained in New

York State Executive Law, § 296, *et seq.* ("NYSHRL") and New York City Human Rights Law as contained in the Administrative Code of the City of New York, § 8-107, *et seq.* ("NYCHRL") for race, color, national origin, age and disability discrimination and retaliation. Dkt. # 57.

### A.  Ramirez's Background and Experience

Ramirez is sixty-one years old and was born in Guyana. She immigrated to the United States around 1976, when she was 10 or 11 years old and began a long-standing career in public service after serving in the U.S. Army. Plf. 56.1 ¶¶ 62-63.

Ramirez joined the City of New York in 1989 and was promoted to Director (M-2 level) of the Human Resources Administration's ("HRA") Finance Office in 2006, a position she held until her forced retirement in 2025, marking a 37-year tenure. Plf. 56.1 ¶¶ 67-68.

Ramirez had deep expertise in Structured Query Language ("SQL"), Enterprise Data Warehouse ("EDW") systems, and data analytics, and frequently led technical projects of high importance. Plf. 56.1 ¶¶ 69-71. Over the course of her tenure with the City, Ramirez accumulated almost 20 years of managerial experience in technical operations. Plf. 56.1 ¶ 72. Ramirez supervised teams with advanced technical skills, managed cross-departmental projects using SQL and EDW, and was consistently relied upon to produce mission-critical data for internal and external reporting. Plf. 56.1 ¶ 73.

Ramirez's superiors, including Jewram, acknowledged her as a self-sustaining manager, and she managed the Finance Office in the absence of Jewram, her Assistant Deputy Commissioner. Plf. 56.1 ¶¶ 75, 136, 213. This was a function and role that Taylor never assumed. Plf. 56.1 ¶ 88.

### B.  Jewram's Discriminatory Animus based on Age and National Origin

From 2018 to 2022, Ramirez reported directly to Jewram, who made discriminatory comments reflecting animus based on age and national origin. Plf. 56.1 ¶¶ 89, 92. Jewram stated

her dislike of Guyanese people because she believed they were illiterate, expressed relief that her son did not live with a Guyanese woman, and declared that she had finally met an "intelligent" Guyanese doctor. Plf. 56.1 ¶ 19. Jewram also told Ramirez that she did not believe that two Guyanese employees of the city were qualified for their positions and was "glad" when one left the department so younger staff could be hired. Plf. 56.1 ¶ 19.

At different times from 2018 to 2022, Jewram told and made clear to Ramirez that she wanted to fill the department with new and younger people. Plf. 56.1 ¶¶ 19, 21. Jewram was overheard on several occasions saying that two employees were in their 70s or close to it and needed to retire. Plf. 56.1 ¶ 21.

In Spring 2022, Ramirez and Jewram interviewed candidates for a Computer Associate Level 2 position. Ramirez recommended hiring Anthony Mejias, an older candidate with 30+ years of programming experience. Jewram objected, saying, "He's old, he's old," and expressed concern Mejias would retire soon. Ramirez warned Jewram such statements were discriminatory and could result in liability. Despite Jewram's objections, Ramirez hired Mejias on June 27, 2022. Plf. 56.1 ¶ 21. Angered, Jewram began actively looking for opportunities to retaliate against Ramirez. Plf. 56.1 ¶ 32.

### C.  The 2022 Assistant Deputy Commissioner Position

In Fall 2022, shortly after Mejias was hired, Jewram retaliated against Ramirez by deliberately excluding her from the interview process for the ADC position – a promotion that only became available after Jewram was promoted to Deputy Commissioner and vacated the ADC role. Plf. 56.1 ¶ 96. Although Ramirez was highly qualified and had effectively performed the ADC role during Jewram's absences, Jewram failed to inform her of the vacancy.

Ramirez only discovered the posting by chance while browsing online for a position on behalf of a relative. Plf. 56.1 ¶¶ 32, 117. Ramirez was shocked to discover the ADC job posting

on October 17, 2022, and immediately asked two colleagues whether they had been aware that the position had been posted. Plf. 56.1 ¶ 32. One of the colleagues, Lowell Reiter, informed Ramirez that the posting had been made external because Jewram did not want her to see the flyer. Plf. 56.1 ¶ 32. Despite acknowledging that Ramirez was highly qualified for the ADC position and reported directly to her, Jewram testified that she did not believe it was her responsibility to inform Ramirez of the vacancy or the posting. Plf. 56.1 ¶¶ 118-119.

### D.  Jewram's Involvement in Interviewing and Selecting Candidates

Although Jewram testified that she was not involved in the promotion process and had recused herself from the interview panel—even though the ADC position reported directly to her (Plf. 56.1 ¶¶ 107-108)—her actions demonstrate active involvement. She edited the job vacancy notice (Plf. 56.1 ¶ 109(ii)), selected the members of the interview panel (Plf. 56.1 ¶ 109(iv)), printed and reviewed pre-screened resumes and cover letters sent to her (Plf. 56.1 ¶ 109(iii)), determined which candidates would be interviewed (Plf. 56.1 ¶ 109(v)), and ultimately reviewed and signed the request to promote Taylor (Plf. 56.1 ¶¶ 109(vii)–(viii)). These actions directly contradict her claim of recusal and strongly suggest that her asserted neutrality was a pretext to obscure her influence over the outcome. Moreover, the very fact of Jewram's recusal was both rare and unusual, according to Gerdes and Ferdinand, underscoring the atypical nature of the promotion process at play in this instance. Plf. 56.1 ¶¶ 42, 108.

Ramirez submitted her application for the ADC position through NYCAPS on October 21, 2022. Plf. 56.1 ¶¶ 33, 138. However, by that time, Jewram had already moved forward with the interview process, and Ramirez's application was deliberately excluded from the packet reviewed and received by the panel. As the manager of the program area—and the listed interviewer on NYCAPS (Plf. 56.1 ¶ 148)—Jewram was in a position to know that Ramirez had applied, especially since the application was submitted four days before interviews began (Plf. 56.1 ¶¶ 143,

176). The exclusion of Ramirez's application, despite Jewram's direct oversight of the process and her awareness of Ramirez's candidacy, strongly suggests an intentional effort to block her from consideration.

At the time of the interviews, Ramirez had over twenty years of experience in the unit (Plf. 56.1 ¶ 23), while Taylor had only eight. Jewram readily acknowledged this disparity, admitting that she had to provide Taylor with "a lot of guidance," apparently due to Taylor's relative inexperience. Plf. 56.1 ¶¶ 129–130.

Jewram claimed she never inquired whether Ramirez had applied for the position (Plf. 56.1 ¶ 142) and took no steps to ensure Ramirez's application was considered—despite being copied on communications regarding candidate selection. Plf. 56.1 ¶ 197. Interview panelist Gerdes testified that he would have strongly considered Ramirez had he known she applied. Plf. 56.1 ¶ 46. Likewise, the other two panelists, Ferdinand and Collins, were well aware of Ramirez's qualifications and experience, including her expertise in SQL and EDW, a preferred qualification for handling the ADC position. Plf. 56.1 ¶¶ 46, 179-180. Ferdinand testified that she would have interviewed Ramirez had her resume been included in the selection process. Plf. 56.1 ¶ 46. Former Deputy Commissioner Tabitha Brown similarly confirmed that she would have interviewed Ramirez for the position. Plf. 56.1 ¶ 46. In fact, Gordon Kraus-Friedberg, the former ADC before Jewram, testified that had his opinion been solicited, he would have recommended Ramirez for promotion to the ADC role—even before the position was passed to Jewram. Plf. 56.1 ¶ 137.

### E.  Taylor's Selection to Fill the ADC Position

Taylor—the only white candidate interviewed, the only one known to the interviewers (Plf. 56.1 ¶ 45), and notably younger and less experienced than Ramirez—was ultimately selected for the ADC position. Plf. 56.1 ¶¶ 23, 189, 210. Although Taylor received high marks from the interview panelists, both Marcus Angeron—an older minority candidate with the requisite

technical expertise (Plf. 56.1 ¶ 45)—and Ramirez were passed over for the position (Plf. 56.1 ¶ 45). Instead, Taylor, who had no prior experience managing SQL or EDW projects—an integral component of the role—was selected. Notably, Taylor also took credit in his resume for work that had been performed by Ramirez. Plf. 56.1 ¶¶ 187-188.

On October 27, 2022, a promotion request memo was drafted by Gerdes and routed to both Jewram and Ferdinand for review and approval. Plf. 56.1 ¶ 194. Jewram edited the justification language of the memo supporting Taylor's promotion and expressed satisfaction with the decision to promote him. Plf. 56.1 ¶ 197. However, portions of the justification credited Taylor with work that had actually been performed by Ramirez (Plf. 56.1 ¶ 198), while other cited projects—such as the Supplemental Nutrition Assistance Program and Medical Support Enforcement initiatives— predated Taylor's arrival at HRA. Plf. 56.1 ¶ 198.

Taylor was given a 42.56% salary increase and Jewram confirmed that she proposed a salary of $145,000 for Taylor. Plf. 56.1 ¶¶ 201-202. Once Taylor's selection was finalized, Jewram texted former Deputy Commissioner Tabitha Brown, saying, "we will have to celebrate [the promotion] after the holidays". Plf. 56.1 ¶ 204. True to her word, Jewram later celebrated the promotion with both Brown and Taylor. Plf. 56.1 ¶ 206.

### F.  Ramirez's Disabilities and Reasonable Accommodation

Ramirez was not informed of Taylor's promotion—or the fact that she would now report directly to him—until a department-wide email was circulated on January 3, 2023. Plf. 56.1 ¶¶ 208, 212. The announcement was a profound humiliation for her, triggering an immediate physical and emotional breakdown. Ramirez began vomiting in the office and experienced severe anxiety and panic symptoms, prompting her to take immediate leave under the Family and Medical Leave Act ("FMLA"). Plf. 56.1 ¶¶ 210-211, 214-217. In the aftermath, Ramirez was diagnosed with anxiety, shingles, neuropathy, and osteoporosis, and was prescribed multiple medications to

manage her deteriorating health. Plf. 56.1 ¶¶ 51, 220.

When Ramirez exhausted her FMLA leave in April 2023, she was granted a remote work accommodation due to her documented medical condition. Plf. 56.1 ¶ 223. Both Taylor and Jewram initially acknowledged that her telework arrangement posed no undue burden on the department. The accommodation was renewed multiple times through the end of 2024, during which Ramirez consistently performed her duties at the same high level of excellence that had defined her decades-long career. Plf. 56.1 ¶ 50.

However, on December 16, 2024—after the EEO Office contacted him to obtain supervisory approval for an extension of Ramirez's accommodation—Taylor abruptly reversed course and claimed that her remote work arrangement had become a burden. Plf. 56.1 ¶ 52. Taylor cited alleged performance concerns, none of which had ever been documented, communicated to Ramirez, or raised previously. Plf. 56.1 ¶ 52. In fact, Taylor admitted in his testimony that he had no complaints about Ramirez's performance until the very moment he authored that email. Plf. 56.1 ¶ 52.

On December 20, 2024, the EEO Office denied Ramirez's request to extend her remote work accommodation, relying on Taylor's abrupt and unsupported claims made just days earlier. Plf. 56.1 ¶¶ 54, 226. Significantly, this denial came only one day after the Court denied Defendants' motion to dismiss Jewram from the case. Plf. 56.1 ¶ 54. Despite the timing and her central role, Jewram testified that she could not recall whether she had spoken to the EEO Office or communicated any position that Ramirez's accommodation should be denied. Plf. 56.1 ¶ 54.

### G. Appeal of the Denial to Extend Ramirez's Reasonable Accommodation

Ramirez promptly appealed the denial of her accommodation, submitting additional documentation detailing how her medical conditions impacted her ability to perform daily activities. Plf. 56.1 ¶¶ 55, 232-232. While the appeal was still pending, Taylor consulted with

Jewram and then instructed Ramirez to return to the office beginning January 6, 2025, requiring her to work in person Monday through Wednesday and remotely on Thursday and Friday. Plf. 56.1 ¶¶ 55, 235-236. Three days later, Ramirez received a letter formally denying her request to extend the accommodation. Instead of offering a workable solution, the agency proposed impractical alternatives, such as applying for Access-A-Ride or taking long-term leave—options that failed to address her medical limitations or allow her to continue working effectively. Plf. 56.1 ¶¶ 56, 239.

On January 15, 2025 at 10:08 AM, counsel for the parties met and discussed a letter to the court seeking a 60-day extension of time to complete discovery so as to allow Ramirez to file a Second Amended Complaint. Plf. 56.1 ¶¶ 57, 240. On January 15, 2025 at 12:43 PM, on hearing of plans by Ramirez to further amend her complaint to add Taylor as a defendant and add retaliation and constructive discharge claims due to Taylor and Jewram forcing Ramirez into a forced early retirement,  the EEO Office informed Ramirez that it was reviewing her request to explore potential alternatives for her reasonable accommodation and requested additional medical information. Plf. 56.1 ¶¶ 57, 240.

At 2:25 PM on January 23, 2025, the Court granted Ramirez's motion for leave to further amend her complaint. Dkt. # 54; Plf. 56.1 ¶ 57. At 4:06 PM on January 23, 2025, shortly after the Court granted Ramirez leave to file a Second Amended Complaint, the EEO Office emailed Ramirez to revisit her accommodation request and requested new medical documentation— suggesting a possible shift in their position. Plf. 56.1 ¶ 57. The EEO Office, in its January 23 email, advised Ramirez that it "would like to continue to engage you regarding your continued request to work from home on all of your scheduled workdays" and requesting additional information about Ramirez's medical conditions. Plf. 56.1 ¶ 57. Ramirez promptly complied, but HRA EEO Director McBean later admitted that the submitted information was never considered during the appeal process—and no one from the agency ever followed up with Ramirez regarding the status of her

accommodation. Plf. 56.1 ¶ 57.

### H.  Ramirez's Forced Early Retirement

The revocation of Ramirez's accommodation caused her significant emotional and physical distress, leaving her unable to continue under the conditions imposed. As a result, on January 27, 2025, she was forced to submit her early retirement letter, explicitly citing discriminatory and retaliatory conduct as the reasons she could no longer remain employed. Plf. 56.1 ¶¶ 58-60, 243.

In addition, due to Taylor being promoted to the ADC position, there was no upward mobility in the Finance Office and Ramirez had no opportunity to further advance in her career, cutting her off from future positions and salary increases. Plf. 56.1 ¶¶ 59, 243.

Her retirement became effective on March 27, 2025. Plf. 56.1 ¶ 245.

ARGUMENT

### I.  Ramirez Properly Pled a Section 1981 Claim as against Jewram

Defendants first argue that the Section 1981 claims against Jewram must be dismissed because it does not provide a separate private right of action against state actors – only Section 1983 does. *See*, Memorandum of Law in Support of Defendants' Motion for Partial Summary Judgment ("Defs. Memo.") at 8.

The Second Amended Complaint does not assert an independent cause of action under Section 1981 against a state actor. Rather, as Paragraph 1 of the operative complaint expressly states, this is "an action for injunctive relief, declaratory judgment and money damages to remedy discrimination and retaliation… **under Title VII… Section 1981… and Section 1983**." <u>Ex. 64</u>, Second Amended Complaint ("SAC") ¶ 1 (emphasis added).

This language is entirely consistent with binding Second Circuit precedent—namely, *Duplan v. City of New York*, 888 F.3d 612 (2d Cir. 2018)—which holds that Section 1983 provides the exclusive federal vehicle for asserting race discrimination claims based on violations of the

rights secured by Section 1981 against municipal actors such as Jewram.

Moreover, just a cursory glance at the SAC proves Defendants' argument wrong, needless and grasping. In her "Second Cause of Action against Defendant Jewram", Ramirez alleges race discrimination in violation of Sections 1981 and 1983, specifically stating the following:

> "Because of Defendant JEWRAM's willful and deliberate actions,
> and as a proximate cause thereof, Plaintiff has been denied her right
> to equal employment opportunity in violation of Sections 1981 and
> 1983."

**Ex. 64**, SAC ¶¶ 164-169.

To be clear: Ramirez is not asserting a standalone Section 1981 claim against Jewram. Rather, Count II properly pleads a Section 1983 claim for race discrimination based on rights secured by Section 1981. This is entirely permissible and consistent with precedent. *Duplan*, 888 F.3d at 621–22; *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("the express cause of action for damages created by § 1983 constitutes the *exclusive* federal remedy for violation of the rights guaranteed in § 1981 by state governmental units...").

In addition, Defendants unsuccessfully moved to dismiss "Plaintiff's § 1983, NYSHRL and NYCHRL Claims Against… S. Devi Jewram" on September 20, 2024, acknowledging that Ramirez had brought a proper Section 1983 claim against Jewram. Dkt. # 31 at 5-7.

Defendants also do not dispute that Ramirez has plausibly alleged facts showing that Jewram made repeated and overtly racist statements about Guyanese people, including statements that Guyanese people are illiterate, that she was glad her son was not living a Guyanese woman, and that she finally met an intelligent Guyanese doctor—all while supervising Ramirez, who is herself Guyanese of Indian descent. **Ex. 1**, Ramirez Tr. at 91:25–92:15; **Ex. 64**, SAC ¶¶ 51–71. These facts, combined with Ramirez's exclusion from the interview pool for a promotion she was

qualified for and ultimately passed over in favor of a younger, less experienced White male, present a compelling case of race discrimination sufficient to go to the jury.

As such, Ramirez properly pled a Section 1983 claim against Jewram based on race and this prong of Defendants' motion must be outright denied as a misreading of the SAC.

## II. Ramirez Withdraws Age and National Origin Discrimination Claims against Taylor

Defendants next argue that Ramirez's NYSHRL and NYCHRL age and national origin discrimination claims against Taylor must be dismissed because there is no evidence or suggestion that he ever expressed discriminatory animus towards Ramirez because of her age (59 at the relevant time) and/or her Guyanese (of Indian descent) national origin. Defs, Memo. at 8-9.

Defendants' motion for summary judgment as to Ramirez's NYSHRL and NYCHRL claims against Taylor should be denied as moot, as Ramirez formally withdraws those claims against Taylor. The inclusion of Taylor in paragraphs 1 and 187–194 of the SAC was a drafting error, not an intentional effort to assert independent claims of age or national origin discrimination against him under those statutes.

To be clear: the NYSHRL and NYCHRL claims for age and national origin discrimination are asserted only against Defendants Jewram and the City. Had Defendants conferred with Ramirez's counsel before filing this motion, Ramirez would have simply clarified and corrected this issue by stipulation or notice.

Defendants' failure to raise this with Ramirez before moving for partial summary judgment speaks more to litigation tactics than substance. But importantly, Jewram and the City have not moved for summary judgment as to these claims, thereby implicitly conceding their legal viability. This is with good reason: there is abundant record evidence that Jewram made numerous statements evidencing discriminatory animus toward older employees and individuals of Guyanese origin—including but not limited to comments that Guyanese people are illiterate, that an older

candidate should not be hired because he's old, and that the department needed to be filled with younger people.

Such statements, made by a supervisory decisionmaker and directly tied to the adverse employment action in this case (the denial of promotion to Ramirez and subsequent retaliation), are legally imputable to the City and sufficient to require trial on these claims. See *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) (inference of discrimination can be shown by "remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus").

Accordingly, while Ramirez withdraws the NYSHRL and NYCHRL claims as against Taylor, the claims remain fully intact—and trial-worthy—as against Jewram and the City.

### III. Ramirez has Stated Valid Claims of Disability Discrimination and Retaliation against the City under the Rehabilitation Act

Finally, Defendants argue that Ramirez's claims under the Rehabilitation Act that the City discriminated against her based on disability by denying an extension of her full-time telework reasonable accommodation ("RA") and forcing her to resign from her employment and retaliated against her for complaining about disability discrimination should be dismissed. Defs. Memo. at 10. Defendants further claim that the denial of Ramirez's RA is not an adverse employment action and that the City did offer other RA options, Defs. Memo at 11.

#### A.  Legal Standard

A typical disability discrimination claims uses the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). A plaintiff must establish that: (1) her employer is subject to the [Act]; (2) she was disabled; (3) was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. *McMillan v. City of New York*, 711 F.3d 120, 125 (2013).

However, the "*McDonnell Douglas* approach" is less useful "when the parties agree that the employer complains of conduct that is the direct result of the employee's disability" and then "there is no need to evaluate whether the employer's adverse employment action made in response to that conduct is pretextual." *McMillan*, 711 F.3d at 129. In such a case, "pretext is not an issue" and a plaintiff "need only demonstrate that, with reasonable accommodations, he could have performed the essential functions of his job." *Id.*

### B. Ramirez's Prima Facie Claims Under the Rehabilitation Act

#### 1. Ramirez States a Prima Facie Claim

Ramirez has made a prima facie showing that she was denied a continued reasonable accommodation because of her disability, in violation of the Rehabilitation Act. Defendants do not dispute the first three prongs of the prima facie case: that they are subject to the applicable statute; that Ramirez was disabled; and that she was qualified to serve as a Director in the Finance Office. Their only challenges are (1) that the denial of a reasonable accommodation does not constitute an adverse employment action, and (2) that Ramirez's constructive discharge claim fails. Defs. Memo at 11. The second issue is addressed separately.

As to the first, ample authority establishes that denial of a reasonable accommodation is an adverse action, and the record presents triable issues as to whether Defendants' denial was motivated by discriminatory or retaliatory animus.

#### 2. Denial of a Reasonable Accommodation Is an Adverse Action

Defendants are incorrect in arguing that denial of a reasonable accommodation is not an adverse action. Courts have consistently held that denial of benefits, including failure to accommodate a disability, constitutes an adverse employment action. *Little v. NBC*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002); *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 460–61 (S.D.N.Y. 2023) ("Because denials of accommodations can constitute adverse actions

in the retaliation context, Plaintiff has sufficiently alleged an adverse action in the form of her January 2022 disability accommodation request denial.").

### 3. The Record Supports an Inference of Discriminatory and Retaliatory Motive

The record clearly raises an inference of disability discrimination. Ramirez was granted a telework accommodation following her return from FMLA leave in April 2023. It was extended multiple times—through September 8, 2023, January 31, 2024, and again through July 31, 2024. Plf. 56.1 ¶¶ 50, 223. Each extension was approved based on Taylor's express confirmation that Ramirez's performance was satisfactory and that the arrangement did not create any burden. Plf. 56.1 ¶ 50.

Yet on December 16, 2024—just one day after the Court denied Defendants' motion to dismiss and allowed the claims against Jewram to proceed—Taylor suddenly reversed his position, claiming that Ramirez's telework arrangement was an undue burden and citing vague and undocumented "performance concerns." Plf. 56.1 ¶ 52. This shift was directly at odds with his August 22, 2023, statement that Ramirez "continued to manage her staff effectively" while teleworking. Plf. 56.1 ¶¶ 50,52.

Taylor later testified that he had no complaints about Ramirez's work before sending that email. Plf. 56.1 ¶ 52. Jewram confirmed she was unaware of any performance issues, and Ferdinand similarly testified that Ramirez's performance was never flagged during the accommodation review. Plf. 56.1 ¶ 54.

These abrupt, post-litigation reversals raise a strong inference of pretext. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose").

- 15 -

### 4. The Timeline Supports a Retaliatory Inference

The December 2024 request to extend Ramirez's RA followed a series of protected litigation activities:

- The Court denied Defendants' first motion to dismiss on August 22, 2024;

- Ramirez filed her Amended Complaint on September 6, 2024;

- Defendants filed a second motion to dismiss on September 20, 2024;

- The Court denied that motion on December 19, 2024. Plf. 56.1 ¶¶ 264–265.

The EEO Office denied Ramirez's accommodation the next day. By then, Taylor had already discussed the issue with Jewram, consistent with their ongoing coordinated efforts. Plf. 56.1 ¶¶ 54, 236-237 (Taylor texted Jewram about 20 minutes before his January 3 email to ask whether he should reply-all or respond only to Ramirez when directing her to return to the office on January 6.) *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002) (stating that discriminatory intent can be inferred from "the historical background of the decision" and from "the specific sequence of events leading up to the challenged decision.").

### 5. Internal Inconsistencies and Failures in Process Undermine Defendants' Rationale

Taylor's justification was also internally inconsistent. Although he claimed Ramirez needed to be physically present to supervise, he had repeatedly confirmed she managed her staff effectively while teleworking, and no one had ever complained. Plf. 56.1 ¶¶ 52, 54. *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994); *Reeves*, 530 U.S. at 150.

McBean, the EEO Director, testified that revoking a long-standing, successful accommodation may signal discrimination. She confirmed the EEO relied solely on Taylor's email, conducted no follow-up, and did not consider Ramirez's updated medical documentation. Plf. 56.1 ¶¶ 57, 229, 231. *Stratton v. NYC Dept. for Aging*, 132 F.3d 869, 880 n.6 (2d Cir. 1997)

("Actions taken by an employer that disadvantage an employee for no logical reason constitute strong evidence of an intent to discriminate.")

The City's alleged "alternatives"—Access-A-Ride or long-term leave—were unreasonable and medically contraindicated. Ramirez's physician confirmed that she could not commute without significant risk of injury, and even a standing desk was never offered. Plf. 56.1 ¶¶ 55-56, 232, 239. *Goonan v. Fed. Reserve Bank*, 916 F.Supp.2d 470, 483 (S.D.N.Y. 2013) (explaining that as pled, employer's "proposed accommodations would not have accommodated his disability and were therefore unreasonable.").

### 6. Evidence of Pretext in Post-Denial Conduct

Ramirez was ordered to return to work by Taylor and Jewram on January 6. Plf. 56.1 ¶ 57. On January 9, Ramirez made known her intention to amend her complaint to add Taylor as a defendant, and on January 15, 2025—after her RA and appeal had already been denied—the EEO Office abruptly reengaged, stating it was still reviewing her request. Plf. 56.1 ¶ 57, 240. Then, just two hours after the Court granted her motion to amend and add Taylor on January 23, the EEO requested new medical documentation. **Ex. 57**, DEF001084–1087. Yet despite these requests, no one reviewed the materials, and Ramirez never heard back. Plf. 56.1 ¶ 57. *Goonan*, 916 F. Supp. 2d at 480 ("Courts must deny motions to dismiss or motions for summary judgment when presented with conflicting facts about the provenance of a breakdown."); *Sheng v. M&T Bank*, 848 F.3d 78, 87 (2d Cir. 2017); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218 (2d Cir. 2001).

Ferdinand testified she suggested Ramirez be permitted to telework additional days, but Jewram never conveyed that option to EEO. Plf. 56.1 ¶ 241. *Lovejoy-Wilson*, 263 F.3d at 218. ("By requiring reasonable accommodation, 'Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons.'") (internal

citations omitted).

The City's failure to offer feasible accommodations, consider medical evidence it specifically requested, or explore reasonable alternatives—all while contradicting its own prior approvals—creates triable issues of fact under the Rehabilitation Act.

### C. Temporal Proximity Supports an Inference of Retaliation

Defendants argue that the timing of Ramirez's RA denial does not support a causal connection, noting that over three months passed between her filing of the Amended Complaint on September 6, 2024, and the denial of her accommodation request on December 20, 2024. (Defs. Memo at 11–12.) This argument fails.

To establish a prima facie case of retaliation, a plaintiff must show: (1) protected activity, (2) the employer's knowledge, (3) an adverse employment action, and (4) a causal connection between the protected activity and the adverse action. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). Defendants do not dispute that Ramirez engaged in protected activity or that they had knowledge of it. Nor do they dispute that the denial of her RA extension was an adverse action. Thus, the only issue is causation.

Defendants' suggestion that a three-month gap is too long to infer causation is flatly inconsistent with Second Circuit precedent. The Second Circuit has explicitly rejected a bright-line rule and held that "five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110–11 (2d Cir. 2010). Even longer delays are permissible where the denial is the first meaningful opportunity to retaliate. See *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (seven-month gap); *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 131 (2d Cir. 2012) (four years not too long where it was first opportunity to retaliate).

Here, Ramirez's accommodation had been extended in July 2024 and was not up for review again until December—making that month the first opportunity to retaliate. Plf. 56.1 ¶¶ 50, 52, 54.

Even more compelling, the denial of Ramirez's accommodation occurred just one day after the Court denied Defendants' motion to dismiss and allowed the claims against Jewram to proceed. Plf. 56.1 ¶¶ 54, 226.

Courts recognize that the timeline for retaliation may be restarted where a plaintiff takes further protected action in litigation. See *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002); *Doran v. New York State Office of the Medicaid Inspector General,* 2021 WL 2850460, at *8–10 (S.D.N.Y. July 8, 2021); *Foster v. Univ. of Md. E. Shore*, 787 F.3d 243, 253 n.16 (4th Cir. 2015) ((pressing complaint in subsequent hearing is date to determine temporal proximity, not complaint filing date); *Ahmad v. White Plains City Sch. Dist.*, 2020 WL 5720753, at *11 (S.D.N.Y. Sept. 24, 2020).

A jury could reasonably find that Jewram, unable to recall whether she even communicated with EEO about the accommodation request (Plf. 56.1 ¶ 54), directed its denial without a good faith evaluation—especially given the abrupt timing. This striking proximity alone supports an inference of retaliatory motive.

At the pretext stage, Ramirez's burden is to show that retaliation was a but-for or motivating factor in the denial. She meets that burden: the unexplained reversal in Taylor's position, the City's failure to review medical evidence it requested, and the proximity to protected litigation activity together create a strong record from which a jury could infer retaliatory intent. See *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (holding that inconsistent explanations coupled with temporal proximity raise triable issues of fact).

Accordingly, summary judgment must be denied and Plaintiff's discrimination and retaliation claims under the Rehabilitation Act should go to the jury.

### D. Ramirez was Constructively Discharged

Defendants argue that Ramirez was not subjected to conditions so intolerable that a

reasonable person in her position would have felt compelled to resign. Defs. Memo at 13. However, this misstates the standard and ignores a substantial body of case law and record evidence supporting Plaintiff's claim.

Constructive discharge occurs when an employer "intentionally creates an intolerable atmosphere that forces an employee to quit involuntarily." *Flaherty v. Metromail Corp.*, 235 F.3d 133, 138 (2d Cir. 2000) (quoting *Chertkova*, 92 F.3d at 89); *Morris v. Schroder Cap. Mgmt. Int'l*, 481 F.3d 86, 89 (2d Cir. 2007); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983). The standard is met when working conditions are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987).

A constructive discharge claim must be evaluated holistically. *Chertkova*, 92 F.3d at 90; *Halbrook v. Reichhold Chem, Inc.*, 735 F. Supp. 121, 128 (S.D.N.Y. 1990). Courts routinely hold that such claims may be based on the cumulative effect of multiple adverse conditions. *Knight v. MTA N.Y.C. Transit Auth.*, 2021 WL 10424509, at *11 (E.D.N.Y. Sept. 28, 2021). Notably, plaintiffs are not required to prove that forcing them out was the employer's plan all along. *Green v. Brennan*, 578 U.S. 547, 560 (2016).

Here, Ramirez presents ample evidence to create a genuine dispute of material fact. After over 20 years of dedicated service and consistent performance in HRA's Finance Office—with a clear trajectory toward promotion—she was passed over for the ADC position in favor of Taylor, a significantly younger and less experienced white male. Plf. 56.1 ¶¶ 23, 43, 45-46, 49. In fact, that decision not only reflected a discriminatory failure to promote but also marked the end of any realistic opportunity for advancement, effectively blocking Ramirez's long-standing path to ADC and ultimately Deputy Commissioner— an outcome that was untenable given the few remaining years before her anticipated normal retirement. Plf. 56.1 ¶ 59. Courts have found constructive

discharge where, as here, the denial of promotion is coupled with the erosion of future career prospects. *Lopez*, 831 F.2d at 1188–89; *Halbrook*, 735 F. Supp. at 128 ("Halbrook claims that she was forced to quit because Lorelli's promotion tolled 'the death knell for her efforts to become a corporate general counsel.'").

The humiliation of being passed over was compounded by the fact that Ramirez had already been performing ADC-level duties in Jewram's absence. Plf. 56.1 ¶ Plf. 56.1 ¶ 73. Taylor's selection—without a civil service background or comparable managerial experience—sent a message to Ramirez and others that merit and experience would not determine advancement. *Knight*, 2021 WL 10424509, at *11.

Ramirez's emotional and physical reaction to the news was immediate and severe. She testified that upon learning of Taylor's promotion, she felt demeaned and humiliated in front of her colleagues, many of whom knew she was the most qualified, and expected her to assume the ADC position. Plf. 56.1 ¶¶ 59-60, 210, 214. She experienced a rapid heartbeat, vomited in the bathroom, and told a colleague, "I feel like I'm having a nervous breakdown. I need to leave the office." Plf. 56.1 ¶ 215. As the Supreme Court has recognized, a humiliating demotion or change in reporting structure can alone support a constructive discharge claim. *Pa. State Police v. Suders*, 542 U.S. 129, 133, 147 (2004).

After taking FMLA leave, Ramirez developed serious health issues—including anxiety, shingles, neuropathy, and osteoporosis—for which she had no prior history. Plf. 56.1 ¶¶ 50-51, 220. When she returned in April 2023, she was approved for a telework accommodation. Jewram and Taylor were aware of her condition and that reporting in person would cause further harm. Plf. 56.1 ¶¶ 50, 217-218, 223. That accommodation remained in place through December 2024 without issue. Plf. 56.1 ¶ 50.

Yet, once the Court declined to dismiss Jewram from the case, Defendants revoked

Ramirez's accommodation and ordered her to return to the office under Taylor's supervision. Plf. 56.1 ¶¶ 52, 54, 57, 212. Before taking early retirement, Ramirez opted to use annual leave to avoid the humiliation of reporting to Taylor in person. Plf. 56.1 ¶ 57. Courts have recognized that being forced to work under a discriminator or retaliator—especially in face-to-face roles—can itself render conditions intolerable. *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 120 n.4 (1st Cir. 1977).

In her early retirement letter, Ramirez explained that reporting to a supervisor she was better qualified than took an emotional and physical toll and that the denial of accommodation was the final blow that made continued employment untenable. Plf. 56.1 ¶ 59. As in *Chertkova*, these circumstances must be viewed cumulatively, not in isolation. 92 F.3d at 90.

Furthermore, Defendants were fully aware—through multiple physician notes—that Ramirez required full-time telework due to her anxiety and physical limitations. Plf. 56.1 ¶¶ 222, 224-225. Nevertheless, they denied her request without justification and insisted she report to Taylor, the individual whose promotion had triggered her medical crisis. Such conduct, viewed in its totality, easily supports an inference of constructive discharge. *Pendas v. Runyon*, 933 F.Supp. 187, 196 (N.D.N.Y. 1996) (conditions that conflict with medical directives and result in worsening health can support constructive discharge).

Finally, the question of whether an employee's resignation was voluntary or the product of intolerable conditions is one for the jury. *Green v. Town of East Haven*, 952 F.3d 394, 405 (2d Cir. 2020); *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998); *Schoenadel v. YouGov America Inc.*, No. 22-cv-10236 (AS), 2025 WL 371089, at *9 (S.D.N.Y. Feb. 3, 2025). Given the overwhelming evidence of discrimination, retaliation, humiliation, and resulting health deterioration, Ramirez has more than met her burden to present a triable issue as to whether she was constructively discharged.

**CONCLUSION**

Based on all of the above, Ramirez respectfully requests that Defendants' partial motion for summary judgment be denied.

Dated: New York, New York
June 28, 2025

Respectfully Submitted,

_____

**MADUEGBUNA COOPER, LLP**
Attorneys for Plaintiff,
SALLY RAMIREZ
By:    Samuel O. Maduegbuna
30 Wall Street, 8th Floor
New York, NY 10005
(212) 232-0155

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SALLY RAMIREZ,                                               Docket No.: 24-cv-01061-AS

                              Plaintiff,

          -against-
                                                            **CERTIFICATE OF**
CITY OF NEW YORK, S. DEVI JEWRAM, DARSHAN          **COMPLIANCE WITH**
TAYLOR and JOHN and JANE DOE (said names being     **LOCAL RULE 7.1(c)**
fictitious, the persons intended being those who aided and
abetted the unlawful conduct of the named Defendants),

                              Defendants.
-------------------------------------------------------------------X

     Samuel O. Maduegbuna, an attorney admitted to practice law before the Courts of the State

of New York, hereby certifies under Rule 7.1 (c) of the Local Rules of the United States District

Courts for the Southern and Eastern Districts of New York that pursuant to the word count feature

in Microsoft Word, this memorandum of law contains 6,916 words, excluding the caption, tables

and signature block.

Dated:  New York, New York
          June 28, 2025

                              Respectfully Submitted,

                              _____
                              **MADUEGBUNA COOPER, LLP**
                              Attorneys for Plaintiff,
                              SALLY RAMIREZ
              By:     Samuel O. Maduegbuna
                              30 Wall Street, 8th Floor
                              New York, NY 10005
                              (212) 232-0155

- 24 -